**VIRGINIA SUNSHINE ALLIANCE et al., Plaintiffs,**

**v.**

**Joseph M. HENDRIE et al., Defendants.**

**Baltimore Gas and Electric Company et al., Intervenors.**

**Civ. No. 79–1989.**

United States District Court, District of Columbia.

Aug. 31, 1979.

James B. Dougherty, Washington, D. C., for plaintiffs.

Ronald G. Gluck, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM ORDER

PENN, District Judge.

This case comes before the Court on plaintiffs' motion for a preliminary injunction. Plaintiffs seek to have the Court enjoin the defendants from transporting radioactive spent nuclear reactor fuel through the City of Portsmouth, Virginia, and its environs.

The organization plaintiffs are not-for-profit, public-benefit organizations located in the Richmond-Norfolk, Virginia area. Both seek generally to promote the generation and distribution of energy resources in such a way as to ensure public safety and protect the environment. The individual plaintiffs reside in and about the area where the spent fuel would be transported.

### I

Briefly, the facts are as follows: In 1977, the Nuclear Regulatory Commission (NRC) issued licenses to Transnuclear, Inc. to transport spent fuel from Europe to the United States. Transnuclear is required to obtain approval of domestic shipping routes and its proposed physical protection measures prior to transport of nuclear fuel. It obtained approval from NRC, on July 23, 1979, for calls by ship at Portsmouth, Virginia, an urban area, and transport by motor carrier from Portsmouth to the Savannah River Processing facility at Aiken, South Carolina. The approval is for a "short period" and Transnuclear must submit a further analysis of alternative routes by August 31, 1979, to demonstrate that it is not practicable to use a port located outside of a heavily populated area. The requirements that Transnuclear submit a request for approval is found in 44 Fed.Reg. 34467.

Plaintiffs seek to enjoin the transportation of spent fuel through the Portsmouth area and allege (1) that the NRC's approval of the route is arbitrary and capricious because it fails to comply with the interim regulations and the Atomic Energy Act of 1974, 42 U.S.C. §§ 2011 et seq., and (2) that NRC violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, et seq., by failing to prepare an Environmental Impact Study (EIS).

### II

In February 1977, NRC concluded an investigation into the radiological consequences from sabotage of spent fuel casks. *See* Calculations of Radiological Consequences From Sabotage of Shipping Casks for Spent Fuel and High Level Wastes (Deft. Appendix). That study concluded that the unlikely *breach* of the casks would cause only minimum health effects. The casks weigh from 12 to 25 tons and are described in the record (McDonald Aff. ¶¶ 3–6, 11–13, 18) and need not be described here. The casks must meet certain specifications relating to resistance to impact, puncture, fire, and water immersion. (Id., ¶ 8.)

NRC continued its study and in December 1977 issued a Final Environmental Impact Statement (FES). (Deft. Appendix B.) That report concluded that the NRC's regulations governing physical protection of radioactive material during transport were adequate to protect against sabotage or theft. Although spent fuel shipments were not covered by NRC's physical protection regulations at the time the FES was prepared, they were not considered an attractive or practical target for theft or sabotage.

Finally, in May 1978, the Sandia Report (Deft. Appendix C) became available. It concluded that the likelihood of successful sabotage or theft of spent fuel was remote. Nevertheless, the NRC established the additional safeguards described in 44 Fed.Reg. 34467. It is the above regulations permitting transport of spent fuels subject to the additional safeguards which plaintiffs now attack.

The Court has been advised, as have plaintiffs, by counsel for the defendants, that at this time a shipment of spent fuels is not imminent. In the event Transnuclear wishes to ship spent fuels, it is required to give NRC seven days notice *before* the shipment leaves a European port. NRC has

advised the Court that it will immediately inform the Court if and when they receive the seven-day notice for shipment of spent fuel. At that time counsel for plaintiffs shall also be notified. Taking into consideration the seven-day notice, and the time required for any shipment to reach the shores of the United States, it amounts to at least two weeks before any shipment arrives at Portsmouth, Virginia.

## III

■■■ Plaintiffs, in seeking an injunction, must show a likelihood of success on the merits, that they will suffer irreparable injury if the injunction is not granted, that other parties to the action would not be substantially harmed, where lies the public interest. *Virginia Petroleum Jobbers Assoc. v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). The test has been somewhat modified by *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 559 F.2d 841 (1977). After applying the above criteria to the facts set out in the present record, the Court concludes that plaintiffs' motion for preliminary injunction should be denied.

The record indicates that NRC has taken a "hard look" at the possibility of sabotage. Indeed, upon the agency's receipt of the Sandia Report, it issued amended regulations regarding the shipment of spent fuel by motor carriers. 44 Fed.Reg. 34467. It now requires that each shipment be accompanied by at least one driver and one escort in the transport vehicle or one driver in the transport vehicle and two escorts in a separate vehicle. The transport or escort vehicle must be equipped with two-way radios and the driver is required to maintain regular contact with NRC officials. The Sandia Report concluded that the spent fuel casks are not attractive targets for many reasons.

NRC prepared an EIS report, the present issue comes as a result of the Sandia Report, a supplement to the EIS. Considering those reports and the agency's action based upon those reports, the Court cannot find that the agency's decision is arbitrary or capricious or without a rational basis.

Moreover, plaintiffs have not demonstrated that they would suffer any impact if the transports are allowed to proceed. Their concern is understandable, however, it is based upon many "if's" and the speculation that (1) someone or a group is interested in sabotage or theft of a cask at considerable risk to himself, (2) that he has the resources to carry out such an attempt, (3) that if successful he has the equipment to move the heavy casks weighing up to 25 tons, (4) that if successful he has the equipment and the expertise to open the cask without injury to himself keeping in mind that the materials contained therein are radioactive and (5) that all of this can proceed without prompt intervention by security forces. The plaintiffs claim that they will suffer irreparable harm is based upon speculation, speculation about dangers which have been considered by the agency and rejected as being an extremely remote possibility. It appeared to have been remote even before the regulations were amended and is even more so after the amendments and the extra precautions by NRC.

The defendants have set forth reasons why they feel they would be harmed if the Court should grant an injunction—one being that to allow materials to return to this nation hopefully reduces the inventory of such materials in foreign countries.

All of the above factors must be balanced, *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc. supra,* and after consideration of all of those factors the Court concludes that defendants have taken a hard look at the possibility of sabotage in compliance with the NEPA, that the plaintiffs have failed to make a showing that they will suffer irreparable harm if the injunction is not granted, and that the public interest would support the denial of injunctive relief.

It is hereby

ORDERED that plaintiffs' motion for a preliminary injunction shall be denied, and an appropriate order to that effect will be entered.